## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMBER SALCEDO, on behalf of her minor child, L.S., individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>WELLTOK, INC. and PROGRESS SOFTWARE CORPORATION,<br><br>    Defendants. | Case No.: _____<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Amber Salcedo, on behalf of her minor child, L.S., ("Plaintiff"), and on behalf of herself and all others similarly situated, brings this Class Action Complaint against Defendants Welltok, Inc. ("Welltok") and Progress Software Corporation ("PSC") (collectively, "Defendants"). Plaintiff alleges as follows based upon information and belief, investigation of counsel, and her own personal knowledge.

### INTRODUCTION

1.    Plaintiff brings this class action on behalf of her minor child, L.S., and all other individuals whose sensitive personal information was accessed and/or exfiltrated by unauthorized third parties during a massive data breach that exploited a vulnerability in the MOVEit software technology on or about May 30, 2023 (the "Data Breach").

2.    As reported by Welltok, the personally identifying information ("PII") and protected health information ("PHI") that was compromised in the Data Breach includes individuals':

    a.  Names;

    b.  Addresses;

    c.   Telephone numbers;

    d.   Email addresses;

    e.   Social Security Numbers;

    f.   Medicare/Medicaid ID numbers;

    g.   Health insurance information (such as plan or group name);

    h.   Healthcare provider names;

    i.   Prescription names;

    j.   Treatment codes; and/or

    k.   Other health information.[1]

3.    As Defendants are or should have been aware, this type of personal and sensitive data is highly targeted and sought after by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to individuals including Plaintiff and the Class Members.

4.    Defendant Welltok is a Colorado-based Software as a Service (SaaS) company that focuses on patient engagement and works with healthcare plans to provide communications to subscribers about their healthcare.[2] As part of its business operations, Welltok uses a managed file transfer software called MOVEit.

5.    MOVEit software is likewise used by a large number of commercial entities, healthcare providers, and federal and state agencies to transfer large data files.

---

[1]   *Notice of Data Privacy Event*, Welltok (Oct. 24, 2023), https://welltoknotice.wpenginepowered.com/?page_id=23 ("Notice") (last accessed Dec. 14, 2023).

[2] Carly Page, *Hackers Accessed Sensitive Health Data of More Than 8 Million Welltok Patients*, TechCrunch (Nov. 20, 2023), https://techcrunch.com/2023/11/20/hackers-accessed-sensitive-health-data-of-welltok-patients/ (last accessed Dec. 14, 2023).

6.     Defendant PSC is a technology company that acquired the developer of MOVEit in May 2019 for $225 million in order to "bolster [PSC]'s core offerings." Since that time, PSC's core offerings have included selling and/or licensing MOVEit to its enterprise customers.[3]

7.     Since the Data Breach on or about May 30, 2023, a multitude of commercial and governmental entities have announced their data, and therefore the data of millions of their customers, clients, and/or members, has been impacted. The large number of companies that have reported being impacted by the breach underscores the widespread effect and deep consequences of this Data Breach.

8.     Indeed, over 2,600 entities and more than 78 million individuals have been impacted by the Data Breach.[4]

9.     The United States Cybersecurity & Infrastructure Security Agency ("CISA") has identified the data exfiltrators as "CL0P Ransomware Gang," also known as TA505, and reports that the attacks were conducted by exploiting a vulnerability catalogued as "CVE- 2023-34362" in order to exfiltrate data from the underlying MOVEit databases.[5] CISA reports that TA505 has been known both to publish exfiltrated data and to ransom exfiltrated data for profit.

---

[3] *Progress Completes Acquisition of Ipswitch, Inc.*, Sec. Exch. Comm'n (May 1, 2019), https://www.sec.gov/Archives/edgar/data/876167/000087616719000073/ipswitchclose_finalxpressx.htm (last accessed Dec. 14, 2023).
[4] Bert Kondruss, *MOVEit Hack Victim List*, KonBriefing Research, https://konbriefing.com/en-topics/cyber-attacks-moveit-victim-list.html (updated Dec. 11, 2023) (last accessed Dec. 14, 2023).
[5] *#StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, Cybersecurity and & Infrastructure Sec. Agency (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a (last accessed Dec. 14, 2023).

10.     As a result of the Data Breach, Plaintiff and the Class Members have faced, and continue to face, risk of harm due to the exposure and potential misuse of their PII and/or PHI by nefarious criminal hackers.

11.     Plaintiff brings this Complaint on behalf of all persons whose PII and/or PHI was stolen during the Data Breach. Plaintiff asserts claims for negligence, unjust enrichment, and declaratory judgment.

**PARTIES**

12.     Plaintiff Amber Salcedo is an adult, and the natural parent of her minor daughter, L.S., who, at all relevant times, is and was a citizen and resident of the State of Nebraska. Plaintiff's minor child was a patient of one of Welltok's client healthcare providers. In order to receive healthcare services for her minor child, Plaintiff was required to directly or indirectly entrust Welltok with her minor child's PII and PHI. On or about December 4, 2023, Plaintiff received a notification from Welltok informing Plaintiff that her minor child's personal information was compromised and disclosed without authorization to cybercriminals as a result of the Data Breach.

13.     Since the announcement of the Data Breach, Plaintiff has spent considerable time mitigating her minor child's risk of identity theft and researching how to protect her minor daughter from such risk, including monitoring her daughter's accounts and credit, and implementing a credit freeze. Plaintiff has spent additional time researching the Data Breach and the potential risks therefrom, and must continue to spend time monitoring her minor daughter's information and accounts.

14.     Given the nature of the information compromised in the Data Breach and the propensity of cybercriminals to use such information to commit a wide variety of financial and medical identity theft and fraud crimes, Plaintiff's child faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

15.     Defendant Welltok is a for-profit Delaware corporation with its principal place of business located at 1515 Arapahoe Street, Suite 700, Tower III, Denver, Colorado 80202. Defendant Welltok is a citizen of the States of Delaware and Colorado.

16.     Defendant PSC is a for-profit Delaware corporation with its principal place of business located at 15 Wayside Road, Suite 400, Burlington, MA 01803. Defendant PSC is a citizen of the State of Delaware and the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

18.     This Court has specific personal jurisdiction over Defendant Welltok because Welltok is registered to conduct business in Massachusetts; provides its services to a number of Massachusetts healthcare and/or health insurance providers, including Mass General Brigham Health Plan; and derives substantial revenue from its Massachusetts business contacts. Defendant Welltok further has minimum contacts with Massachusetts because it conducts substantial business in the Commonwealth.

19.     This Court has general personal jurisdiction over Defendant PSC because PSC is headquartered in Burlington, Massachusetts and is registered to conduct business in Massachusetts.

20.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in

Massachusetts and because Defendants conduct a substantial part of their business within this District.

**FACTUAL ALLEGATIONS**

**A.    Defendants Provide Technology Services Involving Highly Sensitive Data.**

21.    Defendant Welltok is a Colorado-based healthcare services and support company that provides communications software to healthcare plans to communicate with plan subscribers about their healthcare.[6]

22.    In order to provide these services, Welltok acquires, collects, and stores the PII and PHI of the individuals with whom it facilitates communication, including those individuals' names, contact details, Social Security Numbers, healthcare insurance information, and health information, as listed *supra*.[7]

23.    Due to the sensitivity of the PII and PHI that Welltok handles, it is aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

24.    By obtaining, collecting, and storing Plaintiff's and Class Members' PII and PHI, Welltok assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures. Welltok exemplifies its understanding of these duties; in its posted Data Breach Notice, Welltok promises that it takes "the security of personal information in our care very seriously."[8]

---

[6] Page, *supra* note 2.
[7] *Id.*
[8] *Notice*, *supra* note 1.

25.    However, despite the imposition and acknowledgement of these duties, Welltok failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI, and ultimately allowed nefarious third-party hackers to compromise Plaintiff's and Class Members' PII and PHI during the Data Breach.

26.    Upon information and belief, Welltok utilizes MOVEit software and on-premises hardware to conduct its business operations.[9] By using on-premises MOVEit hardware, *i.e.*, a server, Welltok had physical control over the server that was compromised at the time of the Data Breach.

27.    Defendant PSC also provides services to entities across the nation. PSC licenses its MOVEit software and associated hardware to enable companies, including Welltok, to transfer large volumes of information—and, purportedly, to do so securely. The information handled by MOVEit software and hardware is often highly sensitive, including PII and PHI.

28.    PSC acknowledges the critical nature of safeguarding such PII and PHI in the provision of its services. PSC boasts that MOVEit can "easily ensure the reliability of core business processes, and secure the transfer for sensitive data;" "provides full security, reliability, and compliance;" provides "security, centralized access controls, file encryption and activity tracking needed to ensure operational reliability and compliance;" permits users to "[r]eliabl[y] and easily comply with SLAs, internal governance requirements and regulations;" "reduces errors while mitigating the risk of data loss;"[10] can "transfer sensitive information securely;" and "assure

---

[9] *Id.*
[10] https://www.ipswitch.com/moveit (last accessed Dec. 14, 2023).

regulatory compliance."[11] These features, according to PSC, will "keep sensitive information out of harm's way."[12]

29.    PSC has further held itself out as a data security expert by publishing and advertising a "whitepaper" on its website titled "Ransomware vulnerabilities in file transfer," which purports to teach "how to assure your file transfer servers aren't the launching pad for a ransomware attack."[13]

30.    Despite Defendants' promises to protect sensitive data and efforts to portray themselves as capable data custodians, Defendants' own data security decisions created substantial gaps that Defendants knew or should have known created a risk of a data breach. That risk materialized in May 2023, when hackers broke into Defendants' systems and stole highly sensitive data at will and put Plaintiff and Class Members at risk that their data would be misused and cause them harm.

## B.    Welltok is Subject to HIPAA as a Business Associate of Covered Entities.

31.    Welltok is a HIPAA covered business associate that provides services to various healthcare providers (*i.e.*, HIPAA "Covered Entities"). As a regular and necessary part of its business, Welltok collects and stores the highly sensitive PHI of its clients' patients. Welltok is required under federal law to maintain the strictest confidentiality of the patients' PHI that it acquires, receives, and collects, and Welltok is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

32.    As a HIPAA covered business associate, Welltok is required to enter into contracts with its Covered Entities to ensure that it will implement adequate safeguards to prevent

---

[11] https://www.progress.com/moveit (last accessed Dec. 14, 2023).
[12] *Id.*
[13]    https://www.ipswitch.com/resources/whitepapers-ebooks/ransomware-vulnerabilities-in-file-transfer (last accessed Dec. 14, 2023).

unauthorized use or disclosure of PHI, including by implementing requirements of the HIPAA Security Rule and to report to the Covered Entities any unauthorized use or disclosure of PHI, including incidents that constitute breaches of unsecured PHI as in the case of a data breach like the one complained of herein.

33.     As a condition of receiving Welltok's services, Welltok requires that Covered Entities and their patients, including Plaintiff and Class Members, entrust it with highly sensitive personal information. Due to the nature of Welltok's business, which includes providing communications software to healthcare plans to communicate with plan subscribers about their healthcare, Welltok would be unable to engage in its regular business activities without collecting and aggregating PHI that it knows and understands to be sensitive and confidential.

34.     Plaintiff and Class Members are or were patients whose PHI was maintained by or who received health-related services through Welltok's healthcare clients, and directly or indirectly entrusted Welltok with their PHI.

35.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' sensitive information, Welltok assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII and/or PHI from unauthorized disclosure.

36.     Further, given the application of HIPAA to Welltok, and that Plaintiff and Class Members directly or indirectly entrusted their PHI to Welltok in order to receive healthcare services, Plaintiff and Class Members reasonably expected that Welltok would safeguard their highly sensitive information and keep their PHI confidential.

**C.      Defendants Failed to Safeguard Plaintiff's and Class Members' Information and Exposed PII and PHI to Hackers.**

37.      Upon information and belief, Welltok engaged PSC to provide it with secure file transfer services—MOVEit.

38.      Upon information and belief, Welltok uses MOVEit, to exchange files with its healthcare clients.

39.      Beginning on or around May 30, 2023, the notorious CL0P ransomware gang exploited a vulnerability in the MOVEit software and accessed, copied, and stole Plaintiff's and Class Members' PII and PHI, including information stored on Welltok's MOVEit server.[14] The vulnerability allowed CL0P to escalate user privileges and gain unauthorized access to customer environments.[15] Following the discovery of the initial vulnerability in the file transfer software, five additional vulnerabilities were subsequently discovered.[16]

40.      However, investigations following CL0P's exploitation of the MOVEit vulnerability have subsequently revealed that CL0P had known about this particular vulnerability and had been experimenting with ways to exploit as far back as 2021.[17]

---

[14] CISA, *supra* note 5.

[15] Matt Kapko, *MOVEit Mass Exploit Timeline: How the File-Transfer Services Attacks Entangled Victims*, Cybersecurity Dive (Sept. 25, 2023), https://www.cybersecuritydive.com/news/moveit-breach-timeline/687417/ (last accessed Dec. 14, 2023).

[16] *Id.*

[17] Laurie Iacono et al., *Clop Ransomware Likely Sitting on MOVEit Transfer Vulnerability (CVE-2023-34362) Since 2021*, Kroll (June 8, 2023), https://www.kroll.com/en/insights/publications/cyber/clop-ransomware-moveit-transfer-vulnerability-cve-2023-34362 (last accessed Dec. 14, 2023).

41.    Indeed, one security firm's review of "logs of impacted [MOVEit] clients found evidence of similar [malicious] activity occurring in multiple client environments last year (April 2022) and in some cases as early as July 2021."[18]

42.    The security firm "also discovered the threat actors were testing ways to collect and extract sensitive data from compromised MOVEit Transfer servers as far back as April 2022, likely with the help of automated tools."[19]

43.    As such, the 2022 activity and "[t]he malicious activity appeared to be aimed at exfiltrating Organization IDs ('Org IDs') which identified specific MOVEit Transfer users and would have helped Clop determine which organizations it could access."[20]

44.    According to the Notice sent to affected persons, Welltok was alerted to an earlier compromise of its MOVEit Transfer server on July 26, 2023.[21]

45.    Thereafter, following an investigation, Welltok determined on or about August 11, 2023 that cybercriminals and exploited software vulnerabilities, accessed WellTok's MOVEit transfer server on May 30, 2023, and exfiltrated certain data from the MOVEit transfer server during that time.[22]

46.    On August 26, 2023, Welltok confirmed that patients' PII and PHI was present on the impacted MOVEit server at the time of the Data Breach.

---

[18] Sergiu Gatlan, *Clop Ransomware Likely Testing MOVEit Zero-Day Since 2021*, Bleeping Computer (June 8, 2023), https://www.bleepingcomputer.com/news/security/clop-ransomware-likely-testing-moveit-zero-day-since-2021/ (last accessed Dec. 14, 2023).
[19] *Id.*
[20] Simon Hendery, *Ransomware Gang Clop Prepped Zero-Day MOVEit Attacks in 2021*, SC Magazine (June 9, 2023), https://www.scmagazine.com/news/ransomware-gang-clop-zero-day-moveit-2021 (last accessed Dec. 14, 2023).
[21] Notice, *supra* note 1.
[22] *Id.*

47.    Based on Welltok's public statements, the information compromised in the Data Breach includes, *inter alia*, patient, names; addresses; telephone numbers; email addresses; Social Security Numbers; Medicare/Medicaid ID numbers; health insurance information (such as plan or group name); healthcare provider names; prescription names; treatment codes; and/or other health information.

48.    Welltok reported the Data Breach to the Department of Health and Human Services ("HHS"), indicating that the sensitive information of approximately 8.5 million people had been compromised in the Data Breach.[23] This massive number of affected persons makes the incident the second largest MOVEit-related Data Breach reported thus far.[24]

49.    Despite the Data Breach occurring on or around the end of May 2023, Welltok did not begin notifying impacted patients of the Data Breach until nearly sixth months later on or about November 13, 2023.[25]

50.    Upon information and belief, the Data Breach occurred as a direct result of Defendants' failure to implement and follow basic data security procedures in order to protect individuals' PII and PHI.

**D.    Defendants' Insufficient Data Security Caused the Data Breach.**

51.    Security experts, both private and governmental, have long warned companies that data security must be a top priority. The Federal Trade Commission ("FTC"), for example, has also issued numerous guidelines for businesses highlighting the importance of reasonable data

---

[23] *See Cases Currently Under Investigation*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES OFFICE OF CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Dec.13, 2023) (last accessed Dec. 14, 2023).
[24] Page, *supra* note 2.
[25] *Data Breach Notifications*, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/df6b65ea-c8fb-4a62-a5e8-53fec501fabb.shtml (last accessed Dec. 14, 2023).

security practices. The FTC notes the need to factor data security into all business decision-making.[26] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[27]

52.    The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act").

53.    As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendants] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendants] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and

---

[26] Federal Trade Comm'n, *Start with Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Dec. 14, 2023).
[27] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Dec. 14, 2023).

process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendants] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all proceeded Defendants' Data Breach, further clarify the measures businesses must take to meet their data security obligations.

54.     Although Defendants' businesses involve handling highly sensitive data, Defendants implemented inadequate data security practices that they knew or should have known, especially as technology companies and purported experts in the field, put their clients and their customers at risk of having their PII and PHI exposed.

**E.     The Data Breach was a Foreseeable Risk of which Defendants were on Notice.**

55.     It is well known that PHI and PII are highly sensitive and are frequent, intentional targets of cybercriminals. Companies that collect and handle such information, including Defendants, are well aware of the risk of being targeted by cybercriminals.

56.     Defendants also knew that a breach of their computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

57.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

58.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[28] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

59.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the IRTC, in 2022, there were 1,802 reported data compromises in the United States, the second highest number of data events in a single year and only 60 events short of the record high number of events that occurred in 2021.[29] Of the 1,802 compromises reported in 2022, 98.4% were data breaches, affecting at least 392,180,551 victims in total, and 83% involved the exposure of sensitive records.[30]

60.    In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. The Bureau of Justice Statistics reported that, in 2021, about 23.9 million people in the United States were victims of an identity theft incident, and their losses totaled $16.4 billion.[31] The increasing rate of identity theft is apparent from the directly preceding Bureau of Justice publication, which covered the data from 2018. From

---

[28]  Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed Dec. 14, 2023).

[29] *Data Breach Reports: 2022 End of Year Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 25, 2023), at 7, *available at* https://www.idtheftcenter.org/publication/2022-data-breach-report (last accessed Dec. 14, 2023).

[30] *Id.* at 6, 21.

[31] Erika Harrell & Alexandra Thompson, Victims of Identity Theft, 2021, BUREAU OF JUST. STAT. (Oct. 2023, NCJ 306474), available at https://bjs.ojp.gov/document/vit21.pdf (last accessed Dec. 14, 2023).

2018 to 2021, the number of persons affected increased by approximately one million, and monetary losses increased by $1.3 billion.[32]

61.    PII has considerable value and constitutes an enticing and well-known target for cybercriminals. Hackers can easily sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[33] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

62.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020[34]

63.    Because of the value of PHI, the healthcare industry, specifically, has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[35] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often

---

[32] Erika Harrell, Victims of Identity Theft, 2018, BUREAU OF JUST. STAT. (Apr. 2021, NCJ 256085), available at https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Dec. 14, 2023).
[33] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed Dec. 14, 2023) .
[34] *2022 Breach Barometer*, Protenus, https://blog.protenus.com/key-takeaways-from-the-2022-breach-barometer (last accessed Dec. 14, 2023) .
[35] *The Healthcare Industry is at Risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/, (last accessed Dec. 14, 2023).

problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[36]

64.     Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[37]

65.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[38]

66.     The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[39]

---

[36] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names (last accessed Dec. 14, 2023).

[37] *Id.*

[38] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/, (last accessed Dec. 14, 2023).

[39] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), available at: https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last accessed Dec. 14, 2023).

67.    In light of recent high profile data breaches at other health care partner and provider companies, Defendants knew or should have known that their electronic records and consumers' PII and/or PHI would be targeted by cybercriminals and ransomware attack groups.

68.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves the patients of the healthcare providers using Welltok's and/or PSC's services especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

69.    As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[40] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[41]

70.    According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

---

[40] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last accessed Dec. 14, 2023).

[41] *Managing Cyber Risks in an Interconnected World, Key Findings from the Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last accessed Dec. 14, 2023).

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[42]

71.    Further, according to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have [sic] been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[43]

72.    Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and

---

[42] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed Dec. 14, 2023).
[43] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last accessed Dec. 14, 2023).

increase the likelihood that a victim will be deceived into providing the criminal with additional information.

73.    Based on the value of its patients' PII and PHI to cybercriminals, Defendants certainly knew the importance of safeguarding that information as well as the foreseeable risk of failing to do so. However, Defendants still failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**F.    Defendants Failed to Comply with FTC Guidelines.**

74.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[44]

75.    The FTC's publication, "*Start with Security: A Guide for Business*," sets forth cybersecurity guidelines and best practices for businesses.[45] These guidelines note, *inter alia*, that businesses should: (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on computer networks; (d) understand network vulnerabilities; (e) implement policies to correct security problems. The FTC guidelines further recommend that all businesses use an intrusion

---

[44] *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).
[45] *Start with Security: A guide for Business*, Fed. Trade Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Dec. 14, 2023).

detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[46]

76.    The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77.    Defendants were at all times fully aware of their obligations to protect the PII and PHI of patients because of its position as a business associate, which gave it direct access to reams of patient PII and PHI from the healthcare providers with which it contracts. Defendants were also aware of the significant repercussions that would result from their failure to do so.

78.    Despite their obligations, Defendants failed to properly implement basic data security practices, and Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

**G.    Defendants Failed to Comply with Industry Standards.**

79.    As discussed herein, experts studying cybersecurity routinely identify healthcare providers and partners as being particularly vulnerable to cyberattacks because of the value of the PII and/or PHI which they collect and maintain.

80.    Several best practices have been identified that at a minimum should be implemented by healthcare service Business Associates like Defendants, including but not limited to; educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus,

---

[46] *Id.*

and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

81.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

82.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

83.    Upon information and belief, Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**H.    Defendant Welltok's Data Breach Response is Inadequate.**

84.    The Data Breach affected more than eight million individuals across, but not limited to, the following organizations:

      a.      Asuris Northwest Health;

      b.      BridgeSpan Health;

      c.      Blue Cross and Blue Shield of Minnesota and Blue Plus;

      d.      Blue Cross and Blue Shield of Alabama;

      e.      Blue Cross and Blue Shield of Kansas;

      f.      Blue Cross and Blue Shield of North Carolina;

g.      CHI Health – NE;

h.      CHI Memorial – TN;

i.      CHI Memorial – GA;

j.      CHI St. Joseph Health;

k.      CHI St. Luke's Health Brazosport;

l.      CHI St. Luke's Health Memorial;

m.      CHI St. Vincent;

n.      Corewell Health;

o.      Faith Regional Health Services;

p.      Horizon Blue Cross Blue Shield of New Jersey;

q.      Hospital & Medical Foundation of Paris, Inc. dba Horizon Health;

r.      Marshfield Clinic Health System;

s.      Mass General Brigham Health Plan;

t.      Mercy Health;

u.      Priority Health;

v.      Regence BlueCross BlueShield of Oregon;

w.      Regence BlueShield;

x.      Regence BlueCross BlueShield of Utah;

y.      Regence Blue Shield of Idaho;

z.      St. Bernards Healthcare;

aa.    St Joseph Health;

bb.    St. Alexius Health;

cc.    St. Luke's Health;

dd.    Sutter Health;

ee.    Trane Technologies Company LLC and/or group health plans sponsored by Trane Technologies Company LLC or Trane U.S. Inc.;

ff.    Trinity Health;

gg.    The group health plans of Stanford Health Care, of Stanford Health Care, Lucile Packard Children's Hospital Stanford, Stanford Health Care Tri-Valley, Stanford Medicine Partners, and Packard Children's Health Alliance

hh.    The Guthrie Clinic; and

ii.    Virginia Mason Franciscan Health.[47]

85.    Despite the breadth of the Data Breach's effects, Welltok's response lacked sufficient information and remedies.

86.    For one, Welltok stated that it learned that patients' PII and PHI were on its breached server on August 26, 2023, yet waited until November 6, 2023 to inform those patients.

87.    Additionally, Welltok has merely offered Plaintiff and Class Members one year of credit monitoring services, which is wholly inadequate to protect against the risks that will continue for years to come. Welltok also directed affected individuals to take their own remedial measures, unfairly placing the burden on them in order to avoid its own responsibilities.

88.    While Welltok did post a Data Breach Notice on its website, upon information and belief, it also removed everything else on the website. Its website, welltok.com, now links only to a brief statement and a link to the Notice.[48] Further, as reported by technology experts, the posted

---

[47] Notice, *supra* note 1.
[48] *See* www.welltok.com.

Notice "includes 'noindex' code, which tells search engines to ignore the web page, effectively making it more difficult for affected customers to find the statement by searching for it."[49]

89.    Therefore, Plaintiff and the Class Members need more information as well as further monitoring services to be provided in order to mitigate the risks caused by the Data Breach.

## I.    Plaintiff and Class Members Suffered Damages Due to the Data Breach.

90.    For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

91.    Plaintiff and Class Members entrusted their PII and PHI to Defendants' clients in order to receive healthcare services. Their information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

92.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

93.    Further, as a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have been forced to deal with the effects of the Data Breach.

94.    Plaintiff and Class Members must immediately devote time, energy, and money to mitigating the effects of the Data Breach. These mitigation measures include:

    a.    Monitoring for and discovering fraudulent charges;

    b.    Canceling and reissuing credit and debit cards;

---

[49] Page, *supra* note 2.

c.  Purchasing credit monitoring and identity theft prevention;

d.  Addressing their inability to withdraw funds linked to compromised accounts;

e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.  Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.  Contacting financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.  Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

95.     Moreover, Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their personal data, since potential fraudsters will likely use such information to carry out such targeted schemes against Plaintiff and Class Members.

96.     The PII and PHI maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

97.     Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their personal, PII and/or PHI—which contains the most intimate

details about a person's life, including details of physical and mental ailments, financial standing, and other sensitive information—may be disclosed to the entire world, thereby stripping away their privacy and potentially subjecting them to embarrassment.

98.     As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this action against Defendants on behalf of her minor child, L.S., and on behalf of all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

100.    Specifically, Plaintiff seeks to represent a Class, subject to amendment as appropriate, and defined as follows:

> All individuals in the United States and its territories whose PII and/or PHI were compromised in the Welltok Data Breach that occurred on or around May 30, 2023, including all who were sent a notice of the Data Breach (the "Class").

101.    Excluded from the Class are Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

102.    The proposed Class is defined based on the information available to Plaintiff at this time. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

103.    <u>Numerosity</u>. Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are in excess of eight million individuals whose PII and/or PHI may have been improperly accessed in the Data Breach, and each Class Member is apparently identifiable within Defendants' records.

104.    <u>Commonality</u>. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII and/or PHI;

b.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendants were negligent in maintaining, protecting, and securing PII and/or PHI;

d.    Whether Defendants breached contract promises to safeguard Plaintiff's and the Class's PII and/or PHI;

e.    Whether Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    Whether Defendants' Breach Notice was reasonable;

g.    Whether the Data Breach caused Plaintiff's and the Class's injuries;

h.    What the proper damages measure is; and

i.    Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct.

105. <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class Members. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same unlawful and willful conduct. Defendants were the custodians of Plaintiff's and Class Members' PII and PHI when that information was obtained by an unauthorized third party.

106. <u>Adequacy of Representation</u>. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of Class Members. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to those of the other Members of the Class, and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. In addition, Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

107. <u>Superiority</u>. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

108. <u>Predominance</u>. Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendants

breached their duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

109.    <u>Injunctive Relief</u>. Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

110.    <u>Ascertainability</u>**:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

**COUNT ONE**
**<u>NEGLIGENCE</u>**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

111.    Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

112.    Defendants owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the highly sensitive data they managed and stored on behalf of their clients. This duty arises from multiple sources.

113.    Defendants owed a common law duty to Plaintiff and Class Members to implement reasonable data security measures because it was foreseeable that hackers would target Defendants' data systems, software, and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and Class Members would be harmed. Defendants alone controlled their technology, infrastructure, and cybersecurity. They further knew or should have known that if hackers breached their data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted

30

and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendants' unsecure, unreasonable data security measures.

114.    Additionally, Section 5 of the FTC Act, 15 U.S.C. § 45, required Defendants to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendants' duty to Plaintiff and Class Members. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect highly sensitive data. Defendants, therefore, were required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendants' duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendants acted in violation of § 5 of the FTC Act.

115.    Defendants are obligated to perform their business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiff and Class Members by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and Class Members.

116.    Defendants breached their duty to Plaintiff and Class Members by implementing unreasonable data security measures and by failing to keep data security "top-of-mind" despite understanding and writing about the risk of data breaches involving highly sensitive data and touting their own security capabilities.

117.    Defendants were fully capable of preventing the Data Breach. Defendants, as sophisticated and experienced technology companies, knew of data security measures required or

recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited the scope and depth of the Data Breach. Defendants thus failed to take reasonable measures to secure their systems, creating vulnerability to a breach.

118. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

**COUNT TWO**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

119. Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

120. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including payments made by or on behalf of Plaintiff and Class Members.

121. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

122. Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased goods and/or services from Defendants and/or its agents and in so doing provided Defendants with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

123.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

124.    Plaintiff and Class Members conferred a monetary benefit on Defendants, by paying Defendants as part of Defendants' rendering of services, a portion of which was to have been used for data security measures to secure Plaintiff's and Class Members' Private Information, and by providing Defendants with their valuable Private Information.

125.    Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

126.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

127.    Defendants acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

128.    If Plaintiff and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants.

129.    Plaintiff and Class Members have no adequate remedy at law.

130.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered direct injuries, including:

a.    Theft of their PII and/or PHI;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.      Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.      Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

131.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

132.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them or on their behalf. In the alternative, Defendants should be compelled to refund the amounts that were overpaid for Defendants' services, either by Plaintiff and Class Members or on their behalf.

**COUNT THREE**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

133.    Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

134.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

135.    An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

136.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owed, and continue to owe, a legal duty to secure the sensitive information with which they are entrusted, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

b.    Defendants breached, and continue to breach, their legal duty by failing to employ reasonable measures to secure their customers' personal and financial information; and

c.    Defendants' breach of their legal duty continues to cause harm to Plaintiff and the Class.

137.    The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect their clients' (*i.e.*, Plaintiff's and the Class's) data.

138.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an

adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

139.    The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

140.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of her minor child, L.S., and all others similarly situated, prays for relief as follows:

a.    For an Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff and her Counsel to represent the Class;

b.    For an Order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.    For damages in an amount to be determined by the trier of fact;

d.    For an order of restitution and all other forms of equitable monetary relief;

e.    Declaratory and injunctive relief as described herein;

f.    Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.      Awarding pre- and post-judgment interest on any amounts awarded; and

h.      Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: December 15, 2023                              Respectfully submitted,

                                                      */s/Joseph P.  Guglielmo*
                                                      Joseph P. Guglielmo
                                                      Amanda M. Rolon (*pro hac vice* forthcoming)
                                                      **SCOTT+SCOTT ATTORNEYS AT LAW**
                                                      The Helmsley Building
                                                      230 Park Avenue, 17th Floor
                                                      New York, NY 10169
                                                      Telephone: (212) 223-4478
                                                      jguglielmo@scott-scott.com
                                                      arolon@scott-scott.com

                                                      Erin Green Comite (*pro hac vice* forthcoming)
                                                      **SCOTT+SCOTT ATTORNEYS AT LAW**
                                                      156 S. Main Street, P.O. Box 192
                                                      Colchester, CT 06415
                                                      Telephone: (860) 537-5537
                                                      ecomite@scott-scott.com

                                                      Gary F. Lynch (*pro hac vice forthcoming*)
                                                      **LYNCH CARPENTER LLP**
                                                      1133 Penn Avenue, 5th Floor
                                                      Pittsburgh, PA 15222
                                                      Telephone: (412) 322-9243
                                                      gary@lcllp.com

Daniel R. Karon (*pro hac vice forthcoming*)
**KARON LLC**
700 W. St. Clair Ave.
Suite 200 Cleveland, OH 44113
(216) 622-1851
dkaron@karonllc.com

Jonathan M. Jagher (*pro hac vice forthcoming*)
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
(610) 234.6486
jjagher@fklmlaw.com